Boston Insurance Company & others *vs.* John Fawcett [1] & others.[2]

Suffolk. February 6, 1970. — May 14, 1970.

Present: Wilkins, C.J., Spalding, Kirk, Spiegel, & Reardon, JJ.

*Insurance*, Reinsurance, Cargo insurance, Construction of policy. *Equity Jurisdiction*, Declaratory relief. *Words*, "Cargo loss."

An actual controversy within G. L. c. 231A, § 1, was disclosed by a judge's report of a suit in equity by the insured under a cargo reinsurance policy issued by the defendant underwriters for a declaratory decree as to their obligation to indemnify the plaintiff for sums paid by it as insurer under a basic cargo policy issued by it to an express company and covering the company's liability to shippers and consignees, and the suit could be maintained notwithstanding the fact that a decree establishing liability on the part of the defendants would leave unanswered contested questions of the precise extent of the plaintiff's losses as insurer and of its right to recover from the defendants its expenses in adjusting and settling claims under the basic cargo policy. [537]

Reading together a basic cargo policy, having endorsements required by the Interstate Commerce Commission, issued by an insurer for a premium of $85,000, with a maximum liability limit of $1,000,000, to a trucking company and covering the company's liability to pay shippers and consignees for cargo losses by motor vehicle not in excess of $1,000 each loss, and an "Excess Motor Truck Cargo Reinsurance Policy" issued by underwriters for a premium of $7,000, with a maximum liability limit of $1,000,000, to such insurer and containing their agreement to indemnify it for sums paid by it under the basic cargo policy but "only for the excess of loss over U. S. $75,000 ultimate net loss, each and every loss," it was held that "each and every loss" meant a cargo loss which the insurer would be obligated to pay a shipper or a consignee when such loss exceeded $75,000, and, where it

---

[1] An underwriter at Lloyd's, London, England, and all other underwriters at Lloyd's severally subscribing Lloyd's policy No. 547/RE.428508.

[2] Excess Insurance Company Limited, European General Reinsurance Company of Zurich, Guildhall Insurance Company Limited, Mercantile and General Reinsurance Company Limited, Victory Insurance Company Limited, English and American Insurance Company Limited, River Thames Insurance Company Limited, Sovereign Marine and General Insurance Company Limited, Orion Insurance Company Limited, Drake Insurance Company Limited, Sphere Insurance Company Limited, Assurances Generales (Incendie of Paris) and Eagle Star Insurance Company Limited.

appeared that after the trucking company had petitioned for reorganization under c. 10 of the Bankruptcy Act the insurer paid numerous separate claims of shippers and consignees for cargo losses against the trucking company, no one claim being more than $1,000, but the aggregate of the claims being in excess of $75,000, it was further held that the underwriters were not obligated to pay the insurer so much of its aggregate payment as was in excess of $75,000. [544, 546]

BILL IN EQUITY filed in the Superior Court on March 29, 1966.

The suit was reported by *Cahill, J.*

*Sumner H. Babcock (William G. Young* with him) for the plaintiffs.

*Lane McGovern (John S. Hopkins, III,* with him) for the defendants.

KIRK, J.    This bill for a declaratory decree comes to us at the request of the parties on a report without decision by a judge of the Superior Court on a statement of agreed facts and the pleadings.

The plaintiff Boston Insurance Company (Boston) is a Massachusetts insurance corporation.[3]    The defendants have submitted to the jurisdiction of the court.

We first delineate a skeleton of facts to suggest the nature of the substantive issue.    Boston is the insured under an "Excess Motor Truck Cargo Reinsurance Policy" issued by the defendants.    The coverage of the reinsurance policy is limited to the excess of loss over $75,000, "each and every loss."    Boston is also an insurer.    It issued to its "Assured," Yale Express System, Inc. (Yale), a basic cargo policy which bore an endorsement required by the Inter-

---

[3] The plaintiff Boston, under a dissolution plan pursuant to G. L. c. 175, § 44, changed the name to Bimar Corporation on June 6, 1966.    On the same date Boston ceded to Continental Insurance Company (Continental), a New York corporation "with an usual place of business in Boston," all of Boston's interests and Continental assumed all of Boston's obligations in Boston's policies and contracts of insurance and reinsurance.    Boston-Old Colony Insurance Company (Boston-Old Colony), also a Massachusetts corporation "with an usual place of business in Boston," and Continental on July 25, 1966, executed a retrocession agreement whereby Boston-Old Colony agreed to reinsure and assume from Continental the insurance business which Continental had acquired from Boston.    Continental and Boston-Old Colony are necessary parties so that they will be bound by and obtain the benefits of the decree in the pending proceeding.

state Commerce, Commission (ICC) obligating Boston to pay cargo losses not in excess of $1,000 to Yale's shippers and consignees. Yale petitioned for reorganization under c. 10 of the Bankruptcy Act. Boston thereafter paid numerous separate claims against Yale, no one claim being more than $1,000, but the aggregate of the claims being in excess of $75,000. The question is whether the defendants under the reinsurance policy must pay Boston so much of the aggregate payment as is in excess of $75,000.

At the outset there arises the question whether this court should decline jurisdiction of the suit because of G. L. c. 231A, § 3, which provides: "The court may refuse to . . . enter a declaratory . . . decree where such . . . decree, if . . . entered, would not terminate the . . . controversy." An interpretation of the reinsurance policy which would impose liability on the defendants would not terminate the entire controversy. On the hypothesis that the defendants are liable, two questions would remain unanswered. One is the precise extent of Boston's losses, despite the mutually accepted fact that they will exceed $75,000. The other is whether Boston is entitled to recover from the defendants its expenses in adjusting and settling the claims. The defendants have expressly reserved the right to contest both of these issues if the main issue is resolved against them.

The interpretation of the reinsurance policy [4] presents an actual controversy between the parties under G. L. c. 231A, § 1. It is the main subject of controversy in the litigation between them. It is the kind of controversy that is especially susceptible of resolution by a declaratory decree. Such a decree would be binding upon the parties. It may indeed prove to be conclusive of the entire litigation. The exercise of jurisdiction by us is sought by Boston and is not opposed by the defendants. To decline jurisdiction would defeat the remedial purpose of the statute. G. L. c. 231A, § 9. We take the case.

---

[4] Although there are three reinsurance policies, the reference to a single reinsurance policy means the Lloyd's policy.

We state the essential facts as derived from the statement of agreed facts and the pleadings. For a premium of $85,000 Boston on January 1, 1965, issued policy MFL 421076 to its assured "Yale Express System, Inc. and all subsidiaries and sub-subsidiaries and affiliated companies or corporations." This policy (Basic Cargo Policy or "the original policy") covered the liability of Yale "as carrier, forwarder, consolidator, warehouseman or in a similar capacity," under a bill of lading or similar instrument from January 1, 1965, to January 1, 1966. The policy covered the liability of Yale "against perils as more specifically set forth in Clause #30." The policy limits were $1,000,000 "in any one loss, disaster or casualty at terminals, garages, or other points" and $1,000,000 on "any one vehicle or . . . land . . . or air conveyance." Typewritten on the printed policy form was the following: "30. This Policy Insures Against: All risks of loss or damage from any cause howsoever or wheresoever occurring except as otherwise excluded herein, including, *with respect to vehicles equipped with mechanical refrigeration or dry ice bunkers* . . . . [Yale's] liability for loss, damage or deterioration caused by or resulting from breakdown or failure of such vehicles or refrigeration units thereof. 31. All claims for loss, damage or expense arising out of any one occurrence shall be adjusted as one claim and from the amount of such adjusted claim there shall be deducted the sum of $5,000" (emphasis *not* supplied).

Yale is a New York corporation. Among its subsidiaries is Yale Transport Corp. (Transport), a common carrier by motor vehicle in interstate and intrastate commerce under certificates granted by the ICC and State authority. Transport is a wholly owned subsidiary of Yale and is also a New York corporation. Pursuant to the requirements of the ICC the Basic Cargo Policy issued by Boston to Yale contained an "Endorsement For Motor Common Carrier Policies of Insurance For Cargo Liability Under Section 215 of the Interstate Commerce Act" (Form B.M.C. 32).

Another and almost wholly owned subsidiary of Yale is Republic Carloading and Distributing Co., Inc. (Republic),

a freight forwarder holding a certificate from the ICC. The Basic Cargo Policy contained a corresponding indorsement issued pursuant to ICC regulations for freight forwarders (Form FF. 32).

Form B.M.C. 32 and Form FF. 32 are substantially identical in their provisions. Form B.M.C. 32 which became part of the Basic Cargo Policy provided in pertinent part that Boston "hereby agrees to pay, within the limits of liability hereinafter provided, any shipper or consignee for all loss of or damage to all property belonging to such shipper or consignee, and coming into the possession of the insured [Yale] in connection with its transportation service, for which loss or damage the insured [Yale] may be held legally liable . . . .

"[N]o . . . provision . . . in the policy, or any other endorsement . . . shall affect in any way the right of any shipper or consignee, or relieve . . . [Boston] from liability for the payment of any claim for which the insured may be held legally liable to compensate shippers or consignees, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured [Yale]. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured [Yale] and . . . [Boston]. The insured agrees to reimburse . . . [Boston] for any payment made by . . . [Boston] on account of any loss or damage involving a breach of the terms of the policy and for any payment that . . . [Boston] would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement. . . . [Boston] shall not be liable for an amount in excess of $2,000, in respect of any loss of or damage to or aggregate of losses or damages of or to the property hereby insured occurring at any one time and place, nor in any event for an amount in excess of $1,000, in respect of the loss of or damage to such property carried on any one motor vehicle, whether or not such losses or damages occur while such property is on a motor vehicle or otherwise."

Attached to the Basic Cargo Policy and a part of it was "Endorsement #13" entitled, "Transit Indemnity Clause" which reads, "As between . . . [Yale] and . . . [Boston], the terms of this policy shall govern . . . [as though Form 32 was not attached] and . . . [Yale] agrees that if . . . [Boston] shall be obliged to pay any claim which it would not have been required to pay except for . . . [Form 32], [Yale] shall reimburse . . . [Boston] for any and all sums . . . which . . . [Boston] shall have paid in connection with such claim."

On May 24, June 1, and June 9, 1965, respectively, Yale, Republic, and Transport filed petitions for reorganization under c. 10 of the Bankruptcy Act. In each case Boston filed proofs of claim (a) for reimbursement for claims paid by it to shippers and consignees under indorsement Form B.M.C. 32 and Form FF. 32, and (b) for expenses incurred in connection with the handling of the claims of the shippers and consignees.

A plan for the reorganization of Republic has been approved. Others are pending. Republic's plan provides for payment to Boston "of one half of the total amounts including expenses paid or incurred by . . . [Boston] on account of Republic, and in addition, the sum of $50,000 has been set aside as a contingency fund to cover future additional payments made and expenses incurred by [Boston]."

Prior to the dates of filing the petitions for reorganization, no claims for cargo damage for amounts under $5,000 in any one case were presented to or paid by Boston. After the filing, however, Boston paid cargo damage claims against Republic in the total amount, up to November 30, 1968, of $188,673.26 on 2,444 claims ranging in face amount from $10 to $1,000. To the same date and within the same value range Boston paid, 1,073 cargo damage claims against Transport for a total of $129,796.34. None of the claims were for cargo damage in excess of $1,000 for property carried on any one motor vehicle or in excess of $2,000 for damage occurring at any one time and place or arising out of any one occurrence.

We now state the essential terms of the reinsurance policies. Boston paid a total premium of $7,000 to the defendants who on April 2, 1965, "respectively," issued to Boston three reinsurance policies "each of which assumed a portion of the risk insured against as therein described." The principal one of the three reinsurance policies was the Lloyd's Policy, 547/RE.428508, which provided inter alia as follows: "This Reinsurance subject to its limitation, terms and conditions, is to indemnify Boston Insurance Company, et al (hereinafter called the Companies) in respect of the sums which they shall become liable to pay and shall pay under Policy No. MFL. 421076 (hereinafter called the original policy).[5] Provided always that the Underwriters subscribing to this Policy shall be liable only for the excess of loss over U. S. $75,000 ultimate net loss, each and every loss (hereinafter referred to as the Primary Limit or Limits) and Underwriters shall then be liable to pay such additional amounts as may be required to be added to the said Primary Limit or Limits to provide a total coverage of U. S. $1,000,000 ultimate net loss, each and every loss. *Definitions* 1. The words 'ultimate net loss' shall be understood to mean the sums actually paid in cash in settlement of losses for which the Companies are liable after making deductions for all recoveries, salvages and other reinsurance . . . ."

The larger of the two reinsurance policies other than Lloyd's provided inter alia: "This Policy to pay up to $925,000 ultimate net loss, each and every loss in excess of $75,000 ultimate net loss, each and every loss in respect of losses arising under Original Policy No. MFL. 421076 issued to Yale Express System, Inc., et al . . . or as more particularly described in Lloyd's Policy No. RE.428508." Each of such two reinsurance policies provided in substance: "The insurance by this Policy is subject to the same terms and conditions as Lloyd's Policy No. RE.428508 on identical subject matter and risk."

All of the reinsurance policies of the defendants recited

---

[5] The Basic Cargo Policy.

that the type of reinsurance was "Excess Motor Truck Cargo Reinsurance."

Effective June 19, 1965, the Basic Cargo Policy and the reinsurance policies were cancelled. A return premium on the reinsurance policies was made by the defendants to Boston in the sum of $3,759. Thereafter through the remainder of the year 1965 there were exchanges of letters between the parties stating their respective contentions. The present litigation resulted.

Boston's contention, as we understand it, is that the large number of small claims against Yale (i.e. the claims against the subsidiaries Republic and Transport) became on the date of the filing of the respective petitions for reorganization under c. 10, two separate aggregate losses to Boston each in excess of $75,000, since on those dates under ICC forms B.M.C. 32 and FF. 32 Boston became legally liable to pay the aggregate amounts to Yale's shippers and consignees. Stated in another way, it appears to be Boston's argument that under the ICC forms Boston assumed as insurer the risk of Yale's inability to meet the obligation to pay the small claims (not in excess of $1,000) covered by the ICC indorsements; that the risk was that Boston would be called upon to make good as surety; that the risk was one which the defendants reinsured against; and that the risk became a reality with the filing of the petitions for reorganization whereupon Boston's "inchoate contingent liabilities crystalized into two distinct and fixed liabilities, each in excess of U. S. $75,000."

The defendants, on the other hand, take the position that the "loss" referred to in the limitation of coverage to the excess of $75,000 "each and every loss" (in the reinsurance policy) is a cargo loss arising out of one occurrence, such as a collision, a hi-jacking or a refrigeration failure, and not an aggregate financial loss to the original insurer caused by the bankruptcy of its insured. Boston's argument, the defendants say, attributes to and adopts one meaning for the word "loss" in the Basic Cargo Policy (a cargo loss to a shipper) but assigns quite a different meaning (aggregate

financial loss to Boston) in the reinsurance policy; and this, despite an absence of language pointing to an intention to a change of meaning.

The efforts of counsel and ourselves have produced nothing in the nature of direct authority on the precise point at issue. We must rely upon general principles for guidance to the right conclusion on the facts. The interrelation among and between the Basic Cargo Policy and indorsements and the reinsurance policies as to subject matter, terminology, parties and time dictates that they be read together. See Williston, Contracts (3d ed.) § 628; Restatement: Contracts, § 235 (c); Corbin, Contracts, § 549, at 190 and n. 28; Thompson, Reinsurance (4th ed.) 267–281. We so read them.

We note also that all the parties to the litigation are large insurance companies long engaged in far-flung activities in that field of economic activity. We are accordingly not disposed to invoke the rule, based on a presumed disparity of experience or acumen, that "ambiguities in the policy are to be construed against the insurer." See *Palmer* v. *Pawtucket Mut. Ins. Co.* 352 Mass. 304, 307. Rather, we impute to all parties the ability to use appropriate language to make clear the risks against which the reinsurance is issued.[6]

The subject matter of Boston's Basic Cargo Policy was quite plainly Yale's liability for loss of or damage to goods received from others for transportation (cargo loss), $5,000 deductible. All three reinsurance policies identified the type of reinsurance as: "Excess Motor Truck Cargo Reinsurance." Of the three reinsurance policies, Lloyd's policy (the largest) states the subject matter of indemnification to be "the sums which . . . [Boston] shall become liable to pay and shall pay under [the Basic Cargo Policy]." This statement of subject matter is followed by the proviso

[6] "The question is not one of morals, nor of public policy; it is no more than the interpretation of certain forms of words, which are not sacred, which have varied, and may be changed at any time to suit the apparent necessities of commercial profit." *Queen Ins. Co.* v. *Globe & Rutgers Fire Ins. Co.* 278 Fed. 770, 780–781 (S. D. N. Y.).

fixing the liability limitations to "the excess of loss over U. S. $75,000 . . . each and every loss." Of the two remaining reinsurance policies the larger, after specifically referring to the Basic Cargo Policy, fixes the liability limitation in the following terms: "This Policy to pay up to $925,000 ultimate net loss, each and every loss in excess of $75,000 ultimate net loss, each and every loss in respect of losses arising under [Basic Cargo Policy] . . . . The insurance by this Policy is subject to the same terms and conditions as Lloyd's Policy No. RE.428508 on identical subject matter and risk."

Another feature common to the Basic Cargo Policy and the reinsurance policies is the maximum liability limit of $1,000,000. There is a marked disparity, however, in the amount of premiums paid.

The overall similarities of language and subject matter lead us to the conclusion that the phrase "each and every loss" in the reinsurance policies means a cargo loss requiring that payment be made by Boston to a shipper or a consignee where the cargo loss is in excess of $75,000 such as might follow from the occurrence of a collision, a refrigeration failure or a hi-jacking. We think it does not mean contextually an aggregate financial loss in excess of $75,000 to Boston made up of a series of small cargo losses suffered by several shippers and consignees.

Boston's elaborate and somewhat intricate argument to persuade us that the defendants are liable to Boston for so much of the aggregated claim as is in excess of $75,000 is based upon the proposition that a new liability to pay in excess of $75,000 arose or came into being when the petitions for reorganization were filed. The source of the proposition, it is said, is in the ICC indorsement forms. We think that the argument is best understood and refuted by the following analysis.

1. If Yale did not have and the law did not require it to have insurance against losses to shippers or consignees, Yale would solely be liable to its shippers or consignees.

2. If Yale had insurance only under the Basic Cargo

Policy, without indorsements, Yale remained solely liable to its shippers or consignees for all losses not in excess of $5,000 and Boston was liable for those over $5,000.

3. Under the Basic Cargo Policy with ICC indorsement forms, made mandatory by Federal law,[7] Boston became liable to pay losses of Yale's shippers or consignees not in excess of $1,000 at the time of the occurrence irrespective of Yale's financial responsibility. Yale, nevertheless, under situation 2 remained solely responsible for losses between $1,000 and $5,000; and Boston remained liable for those in excess of $5,000.

4. Under indorsement No. 13 to the Basic Cargo Policy (the Transit Indemnity Clause), as between Yale and Boston, Yale agreed to reimburse Boston for any payments made by Boston to shippers or consignees under the ICC forms.

5. The result of the interaction of situations 2, 3, and 4, was the creation of certain legal relationships with respect to claims not in excess of $1,000. Boston was liable to pay each of these losses as it occurred with the right to reimbursement from Yale. The filing of the petitions for reorganization by Yale did not bring into being any new duty to pay on the part of Boston. Boston's obligation to pay losses not exceeding $1,000 had already come into being when the cargo losses occurred. The legal effect of the filing of the petitions by Yale was to impair Yale's capability to fulfill its obligation to reimburse Boston. The impairment of Yale's ability to reimburse Boston "for any and all sums . . . which . . . [Boston] shall have paid in connection with [thousands of ICC Form claims]" is not, we think, a "cargo loss" within the meaning of the term "each and every loss" in the reinsurance policies.

Boston argues that the defendants must be taken to have understood that under the Basic Cargo Policy, Boston ran (a) the risk of indemnifying Yale for a loss in excess of $5,000 and (b) the additional risk of standing as surety

---

[7] See 49 U. S. C. §§ 311 (c), 315, 1003 (c) (1964); 49 C. F. R. §§ 174, 405 (1964) (now 49 C. F. R. §§ 1043, 1084 [1970]).

under the ICC forms for Yale's payment of numerous small losses.

Granting, arguendo, that the defendants so understood Boston's risks, it does not follow that Boston's risk (b) of paying each of the many small losses of Yale's shippers or consignees became converted under the terms of the re-insurance policies into a single aggregate loss in excess of $75,000, with the result that the defendants must indemnify Boston to the extent of the excess.

It is our conclusion that a reading of the policies ensemble does not support Boston's contention. If the parties did so intend they did not use language calculated to manifest the intention.

A decree is to be entered declaring that the defendants are not liable to indemnify the plaintiff for sums paid by the plaintiff to shippers and consignees under forms B.M.C. 32 and FF. 32 attached to Basic Cargo Policy MFL. 421076.

*So ordered.*