**ECONOMY PREMIER ASSURANCE COMPANY, Appellant,**

v.

**WESTERN NATIONAL MUTUAL INSURANCE COMPANY,**
**Respondent.**

No. A13–0621.

Court of Appeals of Minnesota.

Nov. 25, 2013.

William L. Davidson, Timothy J. O'Connor, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, MN, for appellant.

James T. Martin, Gislason, Martin, Varpness & Janes, PA, Edina, MN, for respondent.

Considered and decided by HUDSON, Presiding Judge; HALBROOKS, Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

This is a coverage dispute between two insurance companies. Luke Hylden was driving his father's pickup truck when he collided with another car and injured the driver. Hylden's father had lent him the truck because the car Hylden usually drove, owned by his mother, was broken down. Hylden was insured under the policies that each of his parents had taken out for his and her respective vehicle. Hylden's father's insurer, Economy Premier, paid damages to the victim and then sued Western National, the insurer for Hylden's mother, seeking a declaratory judgment for reimbursement stating that Western National, not Economy Premier, is responsible for the primary coverage. The district court interpreted the policy language and granted summary judgment to Western National. Because we read Western National's policy as providing only excess liability coverage and not primary coverage under the circumstances, we affirm.

## FACTS

Luke Hylden collided with Sheila Smith while he was driving his father's pickup truck in 2009. Smith was injured. Luke's parents are divorced, and Luke, then 18 years old, was living with his mother. She owned two vehicles insured by Western National Mutual Insurance Company. Hylden was an insured driver under that policy, and he customarily drove his mother's Ford LTD. But the LTD was inoperable in March 2009, pending repair. So Hylden got permission from his father to drive his Ford F–150 pickup truck. Hylden's father insured the F–150 under a policy issued by Economy Premier Assurance Company. Hylden was also an insured under that policy. After the collision, Smith negotiated with Economy Premier and Western National, settling on a total payment of $212,000.

Economy Premier then brought this action. It claims that Western National has the primary coverage for Hylden's collision

even though the pickup he was driving is expressly identified in Hylden's father's Economy Premier policy. It argued to the district court that the pickup constituted a "temporary loaned vehicle" as that term appears in Hylden's mother's Western National policy, and that Western National's policy assumes primary coverage for that category of vehicle. The district court construed both companies' policies, rejected Economy Premier's proposed interpretation, deemed Economy Premier responsible for primary coverage, and entered summary judgment in Western National's favor. Economy Premier appeals that decision.

## ISSUE

Does the truck Luke Hylden was driving qualify as a "temporary substitute vehicle" under the Western National insurance policy at issue?

## ANALYSIS

Economy Premier contends that the district court improperly decided the parties' competing summary judgment motions. We review an appeal from a grant of summary judgment on undisputed material facts de novo, as a question of law. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 666 N.W.2d 328, 330 (Minn.2003). The parties have stipulated to the relevant facts. Interpreting an insurance policy also poses a question of law that we review de novo. *Mitsch v. Am. Nat'l Prop. & Cas. Co.*, 736 N.W.2d 355, 358 (Minn.App.2007), *review denied* (Minn. Oct. 24, 2007).

■ Economy Premier argues that Western National bears the primary liability coverage for the collision. The argument must overcome a general presumption against it. That is, automobile insurance typically follows the vehicle rather than the driver. *Hilden v. Iowa Nat'l Mut. Ins. Co.*, 365 N.W.2d 765, 769 (Minn.1985). And in this case, Economy Premier issued the policy that covers the specific vehicle involved in the collision. So Economy Premier must rebut the presumption to prevail.

■ How we interpret the insurance contracts will determine how we answer the question of coverage. We interpret insurance contracts under the general rules of contract law, giving terms their plain and ordinary meaning to honor the intent of the parties. *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn.2013).

■ Economy Premier begins with the broad argument that Western National agreed to provide primary coverage, even though it was not required to do so, by promising expansively to "pay damages for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." This argument is unpersuasive. We construe contract terms in light of the whole and will not read the policy language to negate a term if a viable alternate reading is consistent with the parties' general intent and would give meaning to every term. *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn.2013). Economy Premier reads narrowly language that is qualified by the "other insurance" provision in Western National's contract, which imposes limits on the coverage guaranteed elsewhere in the policy. Because we read the contract as a whole in light of all provisions, we believe that the broad statements of coverage on which Economy Premier relies do not end the analysis; they must instead be considered together with the limitations in Western National's contract.

Hylden's father's Economy Premier policy—the policy that names the pickup involved in the accident—contains an "other

insurance" provision. The provision states that "[i]f you or anyone else insured by [this policy] for liability claims also have coverage under some other policy providing liability coverage, [this policy] will be excess over the other liability insurance." By contrast, Hylden's mother's policy commits Western National to "pay damages for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." The policy also includes an "other insurance" provision, outlined in an endorsement that amends policies underwritten in Minnesota:

1. If there is other applicable insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. Except as provided in 2. below, any insurance we provide for a vehicle you do not own, including any vehicle while used as a temporary substitute for "your covered auto," shall be excess over any other collectible insurance.

2. With respect to a vehicle you do not own which is a "rental vehicle" or "temporary loaned vehicle," we will provide coverage on a primary basis.

The first paragraph of the amended "other insurance" provision of Western National's policy is nearly identical to the provision found in Western National's standard policy, but the second paragraph, which includes the disputed term "temporary loaned vehicle," is only present in a Minnesota-specific amendment to the policy. The Minnesota-specific amendment also defines "rental vehicle" and "temporary loaned vehicle," terms included in the second paragraph of the amended "other insurance" provision. Western National's policy therefore effectively creates two categories of vehicles for purposes of its "other insurance" provision in Minnesota insurance policies like the one issued to Hylden's mother: those vehicles (such as "rental vehicles" or "temporary loaned vehicles") for which Western National assumes *primary* liability coverage, and those vehicles (such as "temporary substitute" vehicles) for which it will provide only *excess* insurance coverage over the coverage provided by some other insurer.

The epicenter of this lawsuit is the term "temporary loaned vehicle" in Western National's policy. Western National's policy defines the term, in pertinent part, as "a ... pickup ... if such a vehicle is loaned as a replacement for 'your covered auto' being serviced or repaired regardless of whether the customer, who is provided the replacement vehicle, is charged a fee for the use of such vehicle." The policy does not define the term "temporary substitute."

The parties hotly contest the meaning we should ascribe to these terms. Economy Premier contends that Hylden's father's pickup fits the definition of a "temporary loaned vehicle" and that Western National therefore must provide primary coverage for the damages caused by the accident and Economy Premier is only secondarily liable. It urges that because Western National drafted an ambiguous "other insurance" provision, Western National's coverage is primary. The allegedly ambiguous provision states that Western National will provide primary coverage for any accident that occurs while an insured is driving a "temporary loaned vehicle" but only excess coverage if the insured is driving a "temporary substitute" vehicle. Economy Premier contends that the truck fits the definition of a "temporary loaned vehicle" because it was "loaned [to Hylden] as a replacement for 'your covered auto' being serviced or repaired." Western National

asserts that the truck was instead a "temporary substitute" for Hylden's "covered auto," insisting that the "temporary loaned vehicle" category applies only to vehicles provided temporarily by repair shops while a covered vehicle is being serviced. Because the policy does not *expressly* support either position, Economy Premier maintains that an ambiguity arises and that the ambiguity must be resolved by applying the doctrine of *contra proferentem*. Applying that doctrine, argues Economy Premier, we should construe the ambiguous terms against Western National providing only excess coverage and in favor of Western National providing primary coverage. We are not persuaded.

■■ *Contra proferentem* has a usual application. In the typical coverage contest between an insurer and its insured, ambiguous terms in the insurance policy are construed in favor of the insured. *Kastning v. State Farm Ins. Cos.,* 821 N.W.2d 621, 624 (Minn.App.2012). This rule of construction recognizes the disparity in bargaining power that typically exists between an insurer and an insured, particularly since insurance contracts are often contracts of adhesion. *Thommes v. Milwaukee Ins. Co.,* 641 N.W.2d 877, 880 (Minn.2002). Likewise, undefined terms subject to multiple interpretations are interpreted in favor of coverage. *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.,* 762 N.W.2d 572, 575 (Minn.2009). We must decide whether Economy Premier is correct that the doctrine applies with the same force in this case, where the contest does not involve the two contracting parties but one contracting party and another entity.

Economy Premier does not explain why it is reasonable for us to apply the doctrine outside its typical context, but its assertion that we should do so raises a question of apparent first impression in Minnesota. Answering it requires a closer look at the doctrine. *Contra proferentem* is well established in contract and insurance law. The common law has recognized the doctrine since the days of Sir Francis Bacon ("[A] man's deeds and his words shall be taken strongliest against himself.") and Sir Edward Coke ("[I]t is a maxim in law, that every man's grant shall be taken by construction of law most forcible against himself."). Francis Bacon, *A Collection of Some Principal Rules and Maxims of the Common Laws of England, with Their Latitude and Extent,* Regula III (1636); 2 Edward Coke, *The First Part of the Institutes of the Laws of England; or, a Commentary upon Littleton* 183(a) (1853). William Blackstone also explained the rule as it applied to deeds:

> [T]he principle of self-preservation will make men sufficiently careful, not to prejudice their own interest by the too extensive meaning of their words: and hereby all manner of deceit ... is avoided; for men would always affect ambiguous and intricate expression, provided they were afterwards at liberty to put their own construction upon them.

2 William Blackstone, *Commentaries* *380.

The doctrine's basic rationale is that the proponent of a term is more likely aware of its possible ambiguities, especially when dealing with standard-form contracts. Restatement (Second) of Contracts § 206 cmt. a (1981). In the general context of contract law, *contra proferentem* has historically been regarded as a last resort, used only when other interpretive methods have failed to reveal the parties' intent. *Corbin on Contracts* § 24.27 (1998); *see, e.g., Yeaton v. Fry,* 9 U.S. 335, 341–42, 5 Cranch 335, 3 L.Ed. 117 (1809) (applying the doctrine when no other means of ascertaining intent were available); *Varnum v. Thruston,* 17 Md. 470, 496, 1861 WL

2156 (1861) (describing the doctrine as one "of strictness and rigor, and not to be resorted to but where other rules of exposition fail"). But the rule has assumed a more prominent role in American insurance law and is now the analytical starting point for courts interpreting ambiguous insurance language. *See, e.g., First Nat'l Bank v. Hartford Fire Ins. Co.*, 95 U.S. 673, 679, 5 Otto 673, 24 L.Ed. 563 (1877) (applying the rule without first assessing the parties' intent); *Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co.*, 263 U.S. 167, 174, 44 S.Ct. 90, 91, 68 L.Ed. 235 (1923) ("The rule is settled that in case of ambiguity that construction of the policy will be adopted which is most favorable to the insured.").

■ Minnesota law follows this approach and applies *contra proferentem* to interpret ambiguities in insurance contracts against the drafter and in favor of finding coverage. *Thommes*, 641 N.W.2d at 880. It does so because insurance policies are often contracts of adhesion, consisting largely of boilerplate terms that are proffered by sophisticated commercial entities and ordinarily accepted by professionally unsophisticated consumers. *Id.* The rule protects the insured, who is usually at a disadvantage in terms of knowledge, expertise, and bargaining power relative to her insurer, but the rule applies even to disputes involving a sophisticated insured with equal bargaining power. *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 180–81 (Minn. 1990). *Contra proferentem* applied in these cases holds parties to the terms they offer in negotiation and provides an incentive, especially for insurance companies who are in a better position to prevent misunderstandings, to avoid including ambiguities. Restatement (Second) of Contracts § 206 cmt. a (1982); *cf. Rusthoven v. Commercial Standard Ins. Co.*, 387

N.W.2d 642, 645 (Minn.1986) (citing the Restatement and applying it in an insurance coverage dispute).

■ This background leads us to decline Economy Premier's urging that we apply the doctrine to this dispute between two insurers, one of which was not a party to the disputed insurance contract. We have discussed why construing ambiguous terms against the drafter and in favor of the nondrafter is justified in a suit between the insurer and the insured. But Economy Premier gives us no reason to conclude that Minnesota law is committed to construing ambiguous contract terms against the insurer to favor a different insurer who is a stranger to the contract. And we have found no Minnesota case applying the doctrine in a suit between two insurers competing to avoid primary coverage. We are convinced that applying the doctrine here would remove it from its primary rationale.

Most jurisdictions agree. Although Minnesota courts have not addressed whether the doctrine of *contra proferentem* applies to nonparties to the contract, other courts have concluded that it does not apply to disputes between two insurance companies arguing over ambiguous language in one company's policy. *See, e.g., U.S. Fid. & Guar. Co. v. Heritage Mut. Ins. Co.*, 230 F.3d 331, 333 (7th Cir. 2000) (quoting *Harden v. Monroe Guar. Ins. Co.*, 626 N.E.2d 814, 817 n. 2 (Ind.Ct. App.1993)) (applying Indiana law and assessing the policy's intent from a neutral perspective because plaintiff had not paid "a penny's premium" to defendant); *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 573–74 (2d Cir.1991) (noting that New York law no longer applies the rule as between insurance companies); *U.S. Fid. & Guar. Co. v. W. Cas. & Sur. Co.*, 195 Kan. 603, 408 P.2d 596, 598 (1965) (finding "no need" to apply the rule in a

dispute between insurers); *Travelers Ins. Co. v. Am. Cas. Co. of Reading, Pa.,* 151 Mont. 198, 441 P.2d 177, 180 (1968) (plaintiff insurer "should get no benefit from construing the policy against" defendant insurer); *Boston Ins. Co. v. Fawcett,* 357 Mass. 535, 258 N.E.2d 771, 776 (1970) (refusing to apply the doctrine in a dispute between insurer and reinsurer). *But see Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.,* 482 F.3d 976, 977–78 (7th Cir.2007) (noting that "argument for *contra proferentem* is pretty feeble" in dispute between insurers but applying it as required by Illinois law); *Commercial Standard Ins. Co. v. Gen. Trucking Co.,* 423 So.2d 168, 171 (Ala.1982) (disagreeing succinctly with argument that court should ignore *contra proferentem* in dispute between insurance carriers); *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.,* 117 Md.App. 72, 699 A.2d 482, 494 (Spec.App.1997) (interpreting ambiguous contract against drafter but noting that Maryland law does not recognize *contra proferentem* ). We have no reason to conclude that Minnesota takes a different approach. We hold that *contra proferentem* does not apply in a coverage suit between insurers. We therefore analyze the ambiguous contract language here from a neutral perspective.

Economy Premier's reading of Western National's policy would have us classify Hylden's father's truck as both a "temporary loaned vehicle" and a "temporary substitute." It suggests that "temporary loaned vehicle" is merely a subcategory of "temporary substitute" vehicles, a class that could also be read to include "rental vehicles." Economy Premier's reading undermines the insurance policy as a whole. Classifying the truck as a "temporary loaned vehicle" would ignore the policy's distinction between the two categories ("loaned" and "substitute" vehicles) and violate the rule to interpret contract language to give effect to all terms. Western National provides primary coverage for one of these classes and only excess coverage for the other. If the truck fits both classifications, at least one contract provision is rendered superfluous, a rendering our interpretation should avoid if possible.

Our interpretation instead reconciles the two categories. The language of the second paragraph of the amended "other insurance" provision, which introduces the term "temporary loaned auto," appears to account for the requirement under Minnesota law that the drivers of vehicles on loan must maintain liability insurance for vehicles that they rent or vehicles they borrow from repair garages, specifically while their primary vehicle is being repaired. A survey of the language of Western National's policy and the evolution of relevant Minnesota law supports this reading.

■ The caselaw interpreting Minnesota's No–Fault Act demonstrates that the act obligates the drivers of vehicles rented or on loan from a service center to maintain primary liability insurance to cover any collision they cause. Our appellate courts interpreted earlier incarnations of this statute to require the owners to carry primary insurance for cars driven by nonowners, including rental cars, *Hertz Corp. v. State Farm Mut. Ins. Co.,* 573 N.W.2d 686, 689 (Minn.1998), and cars lent to customers of repair garages, *Mut. Serv. Cas. Ins. Co. v. W. Bend Mut. Ins. Co.,* 599 N.W.2d 585, 588 (Minn.App.1999), *review denied* (Minn. Dec. 14, 1999). The legislature amended the law in 2000, effectively reversing this arrangement, specifying that coverage under the residual liability policy of the driver of a nonowned vehicle would be primary, and coverage under the policy of the vehicle owner excess, when

[i]nsuring an operator of a rented motor vehicle if the vehicle is loaned as a replacement for a vehicle being serviced or repaired, regardless of whether a fee is charged for the use of the vehicle, provided that the vehicle so loaned is owned by the service or repair business.

Minn.Stat. § 65B.49, subd. 5a(j) (2000).

■ A final change came in 2007, when the legislature amended the statute to read simply, "The plan of [liability coverage for] the owner of a rented motor vehicle is excess of any residual liability coverage insuring an operator of a rented motor vehicle." Minn.Stat. § 65B.49, subd. 5a(j) (2008). As part of this change, the legislature also amended the definition of a rented vehicle to include a vehicle that "is loaned as a replacement for a vehicle being serviced or repaired regardless of whether the customer is charged a fee for the use of the vehicle." Minn.Stat. § 65B.49, subd. 5a(b)(2) (2008). These changes were in place when Western National drafted and issued the Minnesota-specific policy at issue here. This history strongly indicates that Western National's policy tracks Minnesota law; that is, Western National intended to extend its primary liability coverage to collisions in which the insured was driving a vehicle obtained from a garage or repair facility during repair of the named, insured vehicle, not to cases involving just any vehicle borrowed from any source during repair.

Several characteristics of the policy support this conclusion as well. Western National policies do not always distinguish between a "temporary substitute" and a "temporary loaned vehicle," as its standard contract language indicates. The "other insurance" provision and definition of "temporary loaned vehicle" are both found only in the state-specific endorsements to the policy rather than in the body of the main contract. This distinction is specific to the Minnesota endorsement. Western National rightly highlights the context in which the term "temporary loaned vehicle" appears. The term is paired with and follows "rental vehicles" in the provision detailing vehicles for which Western National offers primary coverage. This placement juxtaposes "rental vehicles" and "temporary loaned vehicles" on the one hand, and "temporary substitutes" on the other. This bolsters Western National's assertion that "temporary loaned vehicles" are garage loaners rather than just any substitute vehicle an insured drives pending repair of her covered vehicle.

The use of the word "customer" in the definition of a "temporary loaned vehicle" also belies Economy Premier's reading of the contract. "Customer" in this context refers contextually to the individual "who is provided the replacement vehicle," and the policy defines a vehicle as temporarily loaned when it is "a replacement for 'your covered auto' being serviced or repaired regardless of whether the customer ... is charged a fee for the use of such vehicle." Economy Premier argues for a different meaning; it would have us hold that "customer" in this sentence means simply "insured," as in customer of the insurance company issuing the policy. That's quite a stretch.

Economy Premier attempts to support the argument grammatically. It maintains that the portion of the provision including the word "customer," beginning with the word "regardless," is nonrestrictive and therefore not essential to the meaning. The argument fails. Nonrestrictive clauses are generally distinguished from the indispensable portion of a sentence by a comma. *Chicago Manual of Style* § 6.31 (16th ed.2010). A clause that is not separated from the remainder of the sentence by a comma is essential. *Id.* During oral argument, Economy Premier acknowl-

edged through counsel that the usual rules of grammar undercut the argument but suggested that the court should treat the disputed phrase as nonrestrictive despite the absence of a comma, effectively inserting a comma. Nothing in the sentence's context would support the alteration, and we decline to change the contract. The clause beginning with "regardless" is restrictive.

The meaning suggested by the punctuation is consistent with the meaning suggested by the syntax. The "customer" envisioned by the policy is either an "insured" under the policy, as Economy Premier contends, or someone having work done on his primary vehicle as the "customer" of a commercial facility, as Western National contends. The term "customer" does not appear anywhere else in the policy, while the term "insured" appears repeatedly. Automobile insurance contracts are technical instruments that lack creative flair; they refer to specific classes of people and things using exacting terms, often redundantly. So when a policy introduces a new term, the careful reader will presume that it carries a new idea. And when it repeats a common technical term (particularly here with "insured"—an exclusive term of art as fundamental to the industry as any other), the reader will not presume that the new word is simply the technical term's synonym. The Western National policy never refers to an "insured" by any other name than "insured." The contract language generally and the context specifically give us no reason to think that the only time the word "customer" appears in the policy it means "insured." For these reasons, we hold that the term "customer" in the Minnesota-specific provision is an insured who is an auto-repair customer.

Reading Western National's entire policy from a neutral perspective convinces us that Hylden was not driving a "temporary loaned vehicle" when he collided with Smith and that Economy Premier, not Western National, is obligated to provide primary coverage for Smith's damages. This conclusion eliminates any potential conflict between the "other insurance" provisions of each policy, and we therefore do not reach arguments arising from that issue.

## DECISION

Because the doctrine of *contra proferentem* does not apply to require us to interpret Western National's insurance policy in favor of Economy Premier, we construe any ambiguities in the policy from a neutral perspective. Our neutral reading convinces us that Hylden's father's pickup truck was not a "temporary substitute vehicle" under that policy. Applying the remaining relevant language in the competing insurers' policies, we conclude that Economy Premier provides primarily liability coverage for Hylden's collision.

**Affirmed.**