**Richard J. WARRICK, Appellant,**

v.

**Luis GIRON, et al., Respondents,**

**James H. House, Respondent.**

**No. 49132.**

Supreme Court of Minnesota.

Jan. 18, 1980.

Rehearing Denied April 1, 1980.

---

Schermer, Schwappach, Borkon & Ramstead, Irvin E. Schermer and Dennis R. Letourneau, Minneapolis, for appellant.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, and J. Richard Bland, Minneapolis, for Giron, et al.

Richards, Montgomery, Cobb & Bassford, Greer E. Lockhart and John M. Anderson, Minneapolis, for House.

Heard before ROGOSHESKE, PETERSON, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Plaintiff Richard Warrick brought this medical malpractice action in Hennepin County District Court against Dr. James House, orthopedic surgeon at the University of Minnesota Hospitals; Dr. Nuntiya Hungspreugs, the resident anesthesiologist; and her supervisor, Dr. Luis Giron. Plaintiff alleged that the surgical and medical techniques employed by defendants during an operation on his hand were improper in light of plaintiff's pre-existing medical problems. The jury found in favor of each defendant. Plaintiff appeals, charging error in the trial court's refusal to allow him to litigate the issue of informed consent, refusal to instruct the jury on the doctrine of res ipsa loquitur, and certain evidentiary rulings. We affirm.

In early June 1974, plaintiff, a 25-year-old architectural student at the University of Minnesota, severed a tendon in his left index finger with a scissors. He consulted Dr. James House, an orthopedic surgeon at the University of Minnesota Hospitals, and surgery was scheduled for June 19.

At the time of the accident and resulting surgery, plaintiff suffered from several diseases, diagnosed as Raynaud's phenomenon, polymyositis, asthma, and arthritis. Polymyositis is a condition resulting in the inflammation of the muscles, which affects all the connective tissue and may affect the lungs, heart, and intestinal tract. Raynaud's phenomenon is a reaction of the small blood vessels of the hands and feet to stimulation, particularly exposure to cold, in which these vessels go into spasm, shutting off the flow of blood. Arthritis is a general term for pain and swelling of the joints.

Because of the unpredictable results on the blood vessels of a Raynaud's phenomenon patient, Dr. House decided against anesthetizing plaintiff's finger only, a standard method of anesthesia in surgery of this type. Because of plaintiff's asthma history, general anesthesia was not medically recommended. Dr. Nuntiya Hungspreugs, the resident anesthesiologist, after consulting with her supervisor, Dr. Luis Giron, administered anesthesia of the entire arm, an "axillary block," by injections into the armpit prior to surgery. In order to provide a bloodless field for the operation, Dr. House used a tourniquet on plaintiff's upper arm during the 45-minute surgery.

Although the surgery went as expected, the effect of the anesthesia did not wear off after the operation, and plaintiff's arm and hand remained numb. Some sensory and motor function has since returned; however, plaintiff continues to experience some limitation in the movement of his wrist and hand, and his inability to handle architectural tools prevents him from pursuing his career as an architect.

Four issues are raised on appeal:

1. Did the court abuse its discretion in refusing to allow plaintiff to litigate the issue of informed consent?

2. Did the court err in ruling that the doctrine of res ipsa loquitur was not applicable?

3. Did the court err in withdrawing plaintiff's Exhibit 3, the "complications conference report," from the evidence at the close of trial?

4. Did the court err in admitting testimony of defendants and their experts that they had researched medical literature and had found nothing indicating that the procedures defendants had followed were improper?

1. Plaintiff first argues that the trial court abused its discretion in refusing to allow him to litigate the issue of informed consent. We find no error. Plaintiff's complaint, filed more than three years prior to the trial, alleged that defendants were negligent in performing surgery and administering the anesthetic to him. It did not raise a claim that defendants failed to obtain his informed consent. On the third day of trial, however, counsel for plaintiff raised the issue by asking plaintiff on direct examination whether he would have had the hand surgery had he known the risk that complications would occur.

The decision whether to permit a party to amend pleadings rests within the discretion of the trial court and will not be reversed in the absence of clear abuse of such discretion. *LaSalle Cartage Co., Inc. v. Johnson Brothers Wholesale Liquor Co.,* 302 Minn. 351, 225 N.W.2d 233 (1974); *Sheehan v. St. Peter's Catholic School,* 291 Minn. 1, 6, 188 N.W.2d 868, 871 (1971). In the instant case, no such abuse is shown, where there was a three-year time delay between the filing of the complaint and plaintiff's effort to introduce the informed consent issue, and where necessary witnesses for the litigation of the informed consent issue were absent. Plaintiff made no motion to amend his complaint pursuant to Rule 15.01 of the Rules of Civil Procedure, and at one point during the trial stipulated that informed consent would not be an issue in the case, in order to avoid a continuance. It should also be noted that plaintiff himself failed to name as defendants the doctors who spoke with him prior to the operation, or to bring them into the discovery process.

Under these circumstances, the trial court did not abuse its discretion in refusing to allow plaintiff to litigate the issue of informed consent.

2. The plaintiff next cites as error the trial court's refusal to submit the doctrine of res ipsa loquitur to the jury. Under Minnesota law, a plaintiff must establish three things with regard to the event resulting in his injury before he may submit his claim to the jury on the theory of res ipsa loquitur: (1) The event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c) it must not have been due to any voluntary action or contribution on the part of the plaintiff. *Spannaus v. Otolaryngology Clinic,* 308 Minn. 334, 337, 242 N.W.2d 594, 596 (1976), and cases cited therein.

We need go no further than the first of the criteria to be satisfied that the doctrine of res ipsa loquitur has no application in this case. We have frequently observed that no presumption of negligence arises from the fact that medical treatment leads to unexpected or undesired results. A surgeon is not liable for injuries unavoidably resulting in spite of the exercise of due care in accordance with community standards. *See Ericksen v. Wilson,* 266 Minn. 401, 123 N.W.2d 687 (1963). In the instant case, the injury-producing event involves complex questions of the effect of certain medical treatments on a patient suffering from nerve and muscle disorders not completely understood by the medical profession itself. It is patently not an event about which a lay jury could determine that injury could not result absent some negligence. *See Hoffman v. Naslund,* 274 Minn. 521, 529, 144 N.W.2d 580, 587 (1966). The trial court properly refused to instruct the jury on the doctrine of res ipsa loquitur.

3. A more difficult issue is the propriety of the trial court's withdrawal of plaintiff's Exhibit 3, the "complications conference report." The complications report

is a written record, based on an oral presentation regarding plaintiff's case made by Dr. Hungspreugs at the Anesthesiology Department's regular "morbidity and mortality complications conference."[1] The report was received in evidence without objection on the first day of the trial and was commented upon several times during the course of the trial. On the last day of the trial, it was withdrawn from evidence on a motion of counsel for the defendant anesthesiologists, who argued that the report was inadmissible under the language of Minn.Stat. § 145.64 (1978). That section provides, *inter alia* : "The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization."

In support of his argument that the report should not have been removed from evidence, plaintiff's counsel cites the New Jersey case of *Young v. King*, 136 N.J.Super. 127, 344 A.2d 792 (1975), in which a statute making "utilization review" committee reports inadmissible was held inapplicable to reports by other hospital committees. The New Jersey statute, however, appears on its face to be limited to the type of committee mandatorily established by each hospital under the federal Social Security Act, 42 U.S.C.A. § 1320c–1 (1974). A "review organization" under the Minnesota statute at issue, on the other hand, is defined as a "committee whose membership is limited to professionals and administrative staff * * * and which is established by a hospital * * * to gather and review information relating to the care and treatment of patients for the purposes of * * * (b) [r]educing morbidity or mortal-

ity; * * *." Minn.Stat. § 145.61 (1978). The definition specifically includes, but is not limited to, organizations "established pursuant to" the federal act. Minnesota law makes Exhibit 3 inadmissible.

It is doubtful, moreover, that the complications conference report could have assisted plaintiff greatly. The report states, contrary to Dr. Hungspreugs' testimony at trial, that she administered epinephrine to plaintiff. Although the report has possible impeachment value, proving that epinephrine was in fact administered would not help plaintiff, because he did not establish that it was epinephrine which was harmful to him. In fact, plaintiff's experts insisted that the axillary block and the tourinquet were harmful to plaintiff, regardless of the presence of epinephrine in the anesthetic injection.

The trial court properly withdrew the complications conference report from the evidence. Even had the withdrawal been error, such error would have been harmless.

4. Defendants and their witnesses were permitted, over plaintiff's objection, to testify to methods of research they had used, including textbook searches and computerized searching of recent articles, which they maintained revealed no evidence that the procedures used in plaintiff's surgery were improper. Plaintiff argues that an expert's conclusions about data not in evidence are inadmissible hearsay and that computer evidence should not be admitted absent adequate proof of trustworthiness, an opportunity for rebuttal, and demonstrated relevancy.

The admission of evidence which is objected to on relevancy grounds is a matter within the trial court's discretion, reversible only where clear abuse is shown.

1. Dr. Joseph J. Buckley of the Anesthesiology Department testified that these regularly scheduled conferences:

   * * * are shared by the faculty, the instructors and professors of the department, the residents in training and medical students assigned to the Service at the time. * * * The purpose was to review the quality of care that was being provided by examining any difficult cases that came up that we felt

   were of educational value to the rest of the group, to examine any alleged complications to see whether they were preventable or not. If they were preventable, then to see what mechanisms or policies or procedures should be proscribed in order that they not occur again. In other words, it was an educational process based upon cases that were being handled at the time.

*Renne v. Gustafson*, 292 Minn. 218, 194 N.W.2d 267 (1972). The doctors' testimony was relevant here because the plaintiff commented several times during the course of trial that the impropriety of the techniques used by defendants was a matter of "common knowledge." One defense attorney argued, "I think that [plaintiff's counsel] knows perfectly well that there is nothing in the literature to support what his two doctors said was common knowledge, and there has to be a way, Your Honor, for us to be able to meet that testimony." The testimony was relevant as to whether defendants employed the knowledge which similarly situated specialists would have employed.

Furthermore, the testimony was not hearsay, because it was not offered to establish the truth of any matters asserted in the literature which defendants and their witnesses claimed to have perused. Plaintiff offered no medical literature in support of his position and failed to show why none might exist. Because plaintiff offered no evidence in the literature supporting his position, allowing defendants and their witnesses to testify that their search revealed no evidence that the procedures used were improper was not an abuse of discretion.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.