**STAFFING SPECIFIX, INC., Appellant,**

v.

**TEMPWORKS MANAGEMENT SERVICES, INC., individually and d/b/a TMS Staffing; et al., Respondents.**

**A16-1146**

Court of Appeals of Minnesota.

Filed April 10, 2017

Review Granted in Part June 28, 2017

 

 

 

Christopher P. Parrington, Andrew R. Shedlock, Kutak Rock, LLP, Minneapolis, Minnesota (for appellant).

Daniel J. Cragg, Vince C. Reuter, Gregory L. Singleton, Eckland & Blando LLP, Minneapolis, Minnesota (for respondents).

Considered and decided by Cleary, Chief Judge; Ross, Judge; and Rodenberg, Judge.

## OPINION

CLEARY, Chief Judge

In this appeal from a judgment in favor of appellant Staffing Specifix, Inc. (Staffing) following a jury trial on its breach-of-contract, fraud-in-the-inducement, and defamation claims, Staffing asserts that the district court erred by (1) dismissing its claim of conversion on summary judgment, (2) dismissing its claim of civil theft on summary judgment, (3) denying its motion to amend to add a statutory claim for unpaid commissions, (4) denying its motion to amend to add a claim for punitive damages, and (5) awarding costs and disbursements to certain respondents.

By notice of related appeal, respondents assert that the district court erred in (1) instructing the jury on the breach-of-con-

tract claim, (2) allowing the admission of improper character evidence, and (3) awarding costs and disbursements to Staffing based on a record not before the district court administrator.

We affirm the district court's orders (1) dismissing Staffing's claims of conversion and civil theft, (2) denying Staffing's motion to amend to add a statutory claim for unpaid commissions, and (3) awarding costs and disbursements. We do not address the denial of the motion to add a claim for punitive damages as Staffing did not move for a new trial below. However, because the district court's jury instructions on the breach-of-contract claim materially misstated the law resulting in substantial prejudice to respondents' case, we reverse and remand. We also conclude that the district court erred in admitting improper character evidence.

## FACTS

Staffing is a temporary staffing agency based in Florida owned by Margarita Lermo and run by her son, Alexander Fernandez, who is the CEO. Respondents include a group of family-owned companies—TempWorks Software, Inc., ARA, Inc., and TempWorks Management Services, Inc. (TMS)—as well as the companies' owners and corporate officers. Respondent David Dourgarian is the CEO of the three companies. TempWorks Software provides software for staffing agencies to track temporary workers and businesses requiring workers. ARA provides payroll funding for staffing companies. Respondents describe TMS as a staffing agency "incubator," whereby TMS contracts with smaller staffing agencies that recruit and match temporary workers with businesses. While the smaller staffing companies build their businesses by recruiting and placing temporary workers at jobs, TMS and its sister companies act as the employer of record,

offer payroll services, and provide for the smaller staffing companies' payroll funding and software needs. Respondents explained at trial that TMS profits from management fees that it charges staffing companies and a "buyout fee" that the incubated company must pay when it "graduates" and becomes independent enough to fund its own payroll.

Staffing began doing business with TempWorks Software and ARA in 2011 to obtain software and payroll funding of its temporary workers needing to be paid on a weekly basis while payments from customers using the workers were still pending. Staffing's CEO, Fernandez, testified at trial that he was responsible for negotiating contracts for the company. He testified that typically when entering into a contract, he and Lermo, the owner of Staffing, would read and discuss the contract. If Lermo had questions that Fernandez could not answer, Fernandez would seek clarification.

In December 2012, Staffing negotiated a new contract with TMS. After Fernandez and Lermo examined the initial draft of the contract, which was drafted by TMS, Staffing requested certain changes to the contract. TMS accepted the changes and they were adopted in the final agreement. In late 2012, Staffing and TMS executed the contract called the "TMS services agreement."

Under the TMS services agreement, TMS took over as the employer of record and Staffing continued to receive payroll funding and software support. Under the contract, Staffing became a "limited [c]ustomer services agent of [TMS]" whereby Staffing would recruit temporary workers (called "staffed consultants" in the contract) to perform work for businesses (called "customers" in the contract). Under section 3.6 of the contract, Staffing would earn a commission, which was calculated

by taking the accounts receivable from invoices paid in full by customers each week, and subtracting TMS's "management fees" and other amounts chargeable to Staffing. Section 3.5 defines "management fees" as including, inter alia, the "total cost of payroll," and an administrative fee of 2.95 percent of the gross amount of weekly invoices. Section 4.1 provides that TMS, as the employer of the temporary workers, will "maintain, administer and pay for workers' compensation insurance." Section 7.2 provides that TMS is responsible to pay for workers' compensation costs of all the temporary workers.

Section 14.1 states that the initial term of the TMS services agreement is a fixed term of 18 months, and the contract will automatically renew in 12-month increments, "unless sooner terminated under Article 11, or the mutual, written consent of the parties." Section 11.1 generally allows Staffing to terminate the contract only with the written consent of TMS, and TMS to terminate at any time after the initial term has expired. Section 11.2 provides that, after the first year of the contract, Staffing may terminate by paying a "buy out," which is defined as two times the total management fees that TMS earned in the preceding year, less actual costs of payroll. Section 11.3 allows TMS to terminate on the occurrence of a material breach and lists the events of default. The contract also provides TMS with a security interest in Staffing's business, including its assets, accounts receivable, and computer records.

During negotiations of the contract, TMS quoted a set of workers' compensation rates for Fernandez before Staffing entered into the contract. During the performance of the contract, Fernandez understood that TMS subtracted workers' compensation insurance costs from Staffing's commission. Staffing was to receive weekly commissions under the contract but by its own choice Staffing held a "carry-forward balance" of its commission with TMS, and it would periodically request a release of funds.

On May 29, 2014, Fernandez notified TMS that Staffing did not want to renew the contract after the 18-month term expired that summer. Dourgarian thought that Staffing was terminating the contract and that, under section 11.2 of the contract, Staffing owed TMS a buyout fee. After some dispute, at the end of July 2014, TMS and Staffing ultimately negotiated a separate buyout deal that included a discounted $65,000 buyout fee with a continued software- and payroll-services agreement for three years, in exchange for the ability of Staffing to exit the TMS services agreement. According to Dourgarian, the deal was contingent on a payoff agreement between Staffing and a third-party funder to buy out all of the accounts receivable on TMS's books from invoices due from customers.

In early August 2014, TMS withheld the $65,000 buyout fee from Staffing's carry-forward balance without the final payoff agreement going forward. Dourgarian understood that the buyout fee was an "up front" payment. Fernandez objected to TMS withholding the $65,000 from Staffing's carry-forward balance before the payoff agreement was finalized. Because of Fernandez's objection, Dourgarian said the deal was off but he did not return the $65,000 to Staffing's balance. The deal was put back on the table soon after.

On August 6, 2014, TMS notified Staffing that it would deduct around $71,000 from Staffing's carry-forward balance to offset costs that TMS claims it incurred because it undercharged Staffing for workers' compensation. By August 7, 2014, that amount had been subtracted from Staffing's carry-forward balance. That same

day, Dourgarian spoke with a sales representative from Advance Payroll Funding (Advance), the company Staffing asked to fund the payoff of the accounts receivable. According to Dourgarian, the sales representative told him that Fernandez had a felony record, and Dourgarian believed that the deal with Advance would not happen. Fernandez did not dispute he was convicted of a felony. On or around August 12, Advance told Dourgarian it would not fund Staffing's buyout. Dourgarian said that he was willing to honor the $65,000 buyout agreement until August 15.

By August of 2014, the accounts receivable on TMS's books from Staffing's business with customers were over one million dollars. This was due to the fact that Staffing had a spike in business and was increasingly supplying an international shipping company, Senator International (Senator), with temporary workers, creating greater invoices owed to TMS. According to Dourgarian, he became worried about TMS's exposure to Senator's unpaid invoices. Dourgarian traveled to Florida to investigate the situation at Senator and was satisfied after speaking with people representing the company.

On September 11, 2014, TMS declared that Staffing was in default of the TMS services agreement because Fernandez misrepresented Staffing's ownership, Fernandez was the true owner, and Fernandez had a felony record.

Dourgarian sent two TMS officers, Doug Greene and Mari Kautzman, to Florida to open an office and "repossess" Staffing's business assets, including Staffing's customer relationships. TMS shut down Staffing's access to TempWorks Software applications, and stopped direct deposits to Staffing's temporary workers. Dourgarian said he instructed Greene and Kautzman to visit Staffing's customers with open accounts receivable with TMS, including

Senator. Greene and Kautzman delivered paper paychecks, which were given to the temporary workers. Inside the check envelopes was a letter that told the temporary workers: "We are pleased to announce that as of September 11th, 2014, we will be doing business under a new name, TMS Staffing." The letter informed the temporary workers of TMS's new Miami office.

At trial, Dourgarian admitted that he told Greene and Kautzman to tell Senator that Staffing's real owner was Fernandez and that Fernandez had a felony record, thereby implying that Staffing is owned by a criminal. Dourgarian testified that Greene and Kautzman reported back to him that they communicated this message. At trial, both Greene and Kautzman denied that they did so.

On September 30, 2014, Staffing and TMS entered into a final contract to terminate the TMS services agreement. The new contract, drafted by TMS, called for a company called Tricom to pay around $1.2 million to purchase the accounts receivable. The approximate $1.2 million amount represented 90 percent of the total aging balance of TMS's accounts receivable "plus fees earned by TMS." Dourgarian's view at trial was that Staffing had terminated the TMS services agreement and the "fees earned" included a buyout fee in section 11.2 of that contract. Dourgarian testified that the buyout fee at that point was $280,000, and the $65,000 already moved out of Staffing's carry-forward balance would be subtracted from that amount. The deal also included paying Staffing all commission owed to it. Fernandez testified that his understanding of the Tricom buyout agreement was that it was a termination with TMS's consent and, under section 11.1 of the TMS services agreement, a buyout fee was never owed.

On August 29, 2014, before the Tricom agreement was executed, Staffing filed a lawsuit in district court. Relevant to this appeal, Staffing sued TMS for breach of contract, fraud in the inducement, conversion, and civil theft. On September 17, 2014, the district court partially granted Staffing's motion for a temporary restraining order and ordered TMS to restore all software access and functionality to Staffing. Staffing amended its complaint and sued TMS, Dourgarian, John Reid (TMS's general counsel), Kautzman (TMS's chief operating officer) and Greene (CEO of the TMS office in Ohio) for defamation per se. In response, TMS brought breach-of-contract counterclaims against Staffing.

On August 6, 2015, after cross motions for summary judgment, the district court denied Staffing's motion for summary judgment on the breach-of-contract counterclaims brought against Staffing, and granted respondents' motion for summary judgment in part, dismissing the conversion and civil-theft claims brought against respondents. The district court also denied Staffing's motion for leave to amend the complaint to add a statutory claim for delay in payment of commission.

In November 2015, the parties took the case to a jury trial on Staffing's breach-of-contract, fraud-in-the-inducement, and defamation per se claims. Before the start of trial, the district court found that the TMS services agreement was ambiguous and allowed the parties to present parol evidence to show the intent of the parties. The district court did not specify which contract terms were ambiguous. At trial, the parties' main disagreements were (1) whether under the TMS services agreement, TMS could pass on the workers' compensation costs to Staffing as a "cost of payroll," which under the contract language was a part of TMS's "management fees" subtracted from Staffing's commis-

sion, (2) whether under the termination terms of the TMS services agreement, Staffing owed TMS a buyout fee, and (3) whether TMS and its officers defamed Staffing. A central theme of Staffing's case was that Dourgarian was not credible, dishonest, and acted in bad faith.

On November 18, 2015 (day two of trial), the district court ruled, over respondents' objection, that Staffing could ask Dourgarian, per Minn. R. Evid. 608(b), whether a judge had ever found his testimony not credible. On November 20 (day four of trial), Staffing moved for leave to amend the complaint to add a claim for punitive damages against Dourgarian, which the district court denied as untimely. Over respondents' objection, the district court instructed the jury that "ambiguous contract terms are to be construed against the drafter."

The jury found that (1) TMS breached its contract with Staffing, awarding Staffing $451,732.77 in damages, (2) Dourgarian and TMS were liable for defamation, awarding Staffing $30,000 in damages, and (3) TMS was not liable for fraud. Post-trial, the district court denied respondents' motions for judgment as a matter of law and a new trial.

In March 2016, the parties appealed the district court administrator's award of costs and disbursements. The district court affirmed the court administrator's determination of all of respondents' costs and disbursements, and awarded Staffing additional costs and disbursements on top of the amount originally awarded.

This appeal followed.

## ISSUES

I. Did the district court err in granting summary judgment in favor of respondents on Staffing's conversion claim?

II. Did the district court err in granting summary judgment in favor of respondents on Staffing's civil-theft claim?

III. Did the district court abuse its discretion in denying Staffing's motion to amend the pleadings to add a statutory claim for unpaid commissions?

IV. Did the district court abuse its discretion in denying Staffing's motion brought during trial to amend the pleadings to add a claim for punitive damages?

V. Did the district court abuse its discretion in affirming the court administrator's award of costs and disbursements for certain respondents?

VI. Did the jury instructions regarding interpretation of ambiguous contract terms materially misstate the law and constitute reversible error when the instructions did not prioritize the charge to determine the intent of the parties over construing ambiguous terms against the drafter?

VII. Did the district court abuse its discretion in allowing trial counsel for Staffing to ask Dourgarian if a judge had found his testimony "not credible?" If so, is the error prejudicial requiring a new trial?

VIII. Did the district court abuse its discretion in awarding additional costs and disbursements to Staffing after obtaining information outside of the record of the court administrator?

## ANALYSIS

### I. Summary Judgment on the Conversion Claim

Staffing challenges the district court's grant of summary judgment in favor of respondents and its dismissal of the conversion claim.

Summary judgment is appropriate when there is no genuine issue as to any material fact and either party is entitled to a judgment as a matter of law. Minn. R. Civ. P. 56.03. This court reviews the evidence de novo in the light most favorable to the party against whom judgment is granted. *Ingram v. Syverson*, 674 N.W.2d 233, 235 (Minn. App. 2004), *review denied* (Minn. Apr. 20, 2004).

 Conversion occurs when a person "willfully interferes with the personal property of another without lawful justification, depriving the lawful possessor of use and possession." *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. App. 2003) (quotations omitted). "The elements of common law conversion are: (1) plaintiff holds a property interest; and (2) defendant deprives plaintiff of that interest." *Id.* "Wrongfully refusing to deliver property on demand by the owner constitutes conversion." *Id.* (quotation omitted).

 The district court dismissed the conversion claim under the independent-duty rule. In general, a plaintiff may pursue "two legal remedies for the same wrongful conduct," but there can be no double recovery. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379 (Minn. 1990). However, under the independent-duty rule, "when a plaintiff seeks to recover damages for an alleged breach of contract he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *Wild v. Rarig*, 302 Minn. 419, 440, 234 N.W.2d 775, 789 (1975). "An independent tort may accompany a breach of contract when the defendant has a legal duty to the plaintiff arising separately from any duty imposed in the contract." *Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 696

(Minn. App. 2015), *aff'd*, 886 N.W.2d 208 (Minn. 2016).

Here, Staffing's property interests in funds it claims that respondents converted arose solely from the contracts. Any legal duty that respondents had toward funds owed to Staffing, which formed the basis of Staffing's conversion claim, arose from the contracts. Staffing presented no evidence of an independent tort. The district court did not err in dismissing the conversion claim because respondents were entitled to judgment as a matter of law.

## II. Summary Judgment on the Civil–Theft Claim

The district court also dismissed Staffing's civil-theft claim as a matter of law based on the independent-duty rule and on a factual basis, ruling that there are no facts in the record that respondents used improper methods to initially obtain Staffing's property. The same summary-judgment standards apply.

Under Minn. Stat. § 604.14, subd. 1 (2016), "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." We recently construed the civil-theft statute and concluded that the word "steal" means "that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it." *TCI Bus. Capital, Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 431 (Minn. App. 2017). This definition makes clear that for a person to steal something, there

must be some initial wrongful act in taking possession of the property.

Here, respondents took possession of funds claimed by Staffing without an initial wrongful act because the funds were received from invoices paid by customers and the funds sat in an account owned by TMS. Further, the TMS services agreement provides that respondents "will be the sole and exclusive owner of all accounts receivable." Because there are no facts showing that respondents wrongfully took the funds initially, the district court did not err as a matter of law in dismissing the civil-theft claim.[1]

## III. Motion to Amend the Pleadings to Add a Claim of Unpaid Commissions

The Minnesota Rules of Civil Procedure provide that "a party may amend a pleading only by leave of court or by written consent of the adverse party" if outside the timeframe to amend a pleading as a matter of course, and "leave shall be freely given when justice so requires." Minn. R. Civ. P. 15.01. "The decision whether to permit a party to amend pleadings rests within the discretion of the trial court and will not be reversed in the absence of clear abuse of such discretion." *Warrick v. Giron*, 290 N.W.2d 166, 169 (Minn. 1980).

Leave to amend the pleadings should be liberally granted, except where it would result in prejudice to the other party. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). "If substantial delay will result, an amendment may be denied." *Envall v. Indep. Sch. Dist. No. 704*, 399 N.W.2d 593, 597 (Minn. App. 1987), *review denied* (Minn. Mar. 25, 1987). A court may create a scheduling order, which "shall not

---

1. Because we conclude that there are no issues of material fact as to whether respondents stole the funds claimed by Staffing, we do not decide whether a statutory civil-theft claim is subject to the independent-duty rule.

be modified except by leave of court upon a showing of good cause." Minn. R. Civ. P. 16.02. When a party proposes an amendment that would modify the district court's scheduling order, the party must show "good cause" and act with due diligence in attempting to amend the pleadings. *Hempel v. Creek House Trust*, 743 N.W.2d 305, 313 (Minn. App. 2007).

 The district court denied Staffing's motion to amend because it was not satisfied that Staffing showed "good cause" for delay. Further, the district court found that additional needed discovery would delay a date-certain trial.

The district court did not abuse its discretion because Staffing moved to amend the pleadings on June 10, 2015, months after the scheduled deadline on January 23, 2015. Further, Staffing's argument that it did not know of the claim until discovery was undertaken lacks merit. Staffing had notice of the unpaid-commissions claim from the start of the case because the original TMS services agreement stated: "TempWorks will pay [Staffing] a Commission for [Staffing's] services under this Agreement."

## IV. Motion to Amend the Pleadings to Add a Claim for Punitive Damages

 Staffing next argues that the district court erred when it denied Staffing's motion to amend the complaint to add a claim for punitive damages. Staffing's motion occurred on the fourth day of trial. Generally, in a civil case, "matters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn. 1986). The decision whether to allow an amendment to a pleading to add a claim for punitive damages is a matter of trial procedure. *Doan v. Medtronic, Inc.*, 560 N.W.2d 100, 105 (Minn. App. 1997), *review denied* (Minn. May 14, 1997). Because Staffing failed to move for a new trial, it forfeited its right to appeal the district court's denial of its motion.

## V. Costs and Disbursements to Respondents

Staffing next argues that the district court erred in awarding costs and disbursements to respondents.

The court administrator or district court judge may permit the taxation of any costs and disbursements "allowed by law." Minn. R. Civ. P. 54.04(d). Minn. Stat. § 549.04, subd. 1 (2016), provides that "[i]n every action in a district court, the prevailing party ... shall be allowed reasonable disbursements paid or incurred."

 Appellate courts review a district court's determination on costs and disbursements under an abuse-of-discretion standard. *Dukowitz v. Hannon Sec. Servs.*, 841 N.W.2d 147, 155 (Minn. 2014) "[T]he district court has discretion to determine not only the amount of an award of costs and disbursements, but also who the prevailing party is for purposes of such an award." *Posey v. Fossen*, 707 N.W.2d 712, 714 (Minn. App. 2006). "In multi-party suits, the court has discretion to fairly apportion costs to the parties." *In re Trust Created by Hill*, 499 N.W.2d 475, 494 (Minn. App. 1993), *review denied* (Minn. July 15, 1993). "[T]he district court abuses its discretion when its decision is against logic and facts on the record." *Posey*, 707 N.W.2d at 714.

Respondents' attorney applied to the district court on March 3, 2016, for $26,522.79 in costs and disbursements for respondents Kautzman, Greene, Reid, TempWorks Software, and ARA. Attached to the application were detailed receipts

and invoices. On March 24, the court administrator awarded respondents the full amount requested. On March 31, Staffing appealed the court administrator's decision to the district court pursuant to Minn. R. Civ. P. 54.04(e). The district court affirmed the costs and disbursements awarded to respondents.

 Staffing first argues that the district court abused its discretion, asserting that only Staffing was the prevailing party in this case. "The prevailing party in any action is one in whose favor the decision or verdict is rendered and judgment entered." *Borchert v. Maloney*, 581 N.W.2d 838, 840 (Minn. 1998). The district court and jury rendered decisions and verdicts in favor of respondents Kautzman, Greene, and Reid on the defamation claims. The jury rendered a decision in TMS's favor on the fraud claim. The district court's prevailing-party determinations were not against logic and facts on the record.

 Second, Staffing argues that the district court abused its discretion in awarding disbursements to respondents because Minn. Stat. § 549.04, subd. 1, requires that disbursements be "paid or incurred" and only TMS paid for and incurred disbursements. Staffing argues that, because TMS (a non-prevailing party according to Staffing) paid for the prevailing respondents' disbursements, the various prevailing respondents never "paid or incurred" these disbursements.

Staffing's argument requires us to determine the meaning of "incurred." Statutory interpretation presents a question of law, which appellate courts review de novo. *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001). "Where the legislature's intent is clearly discernable from plain and unambiguous language, statutory construction is neither necessary nor permitted and courts apply the stat-

ute's plain meaning." *Id.* The word "incurred" is an unambiguous term. It means "to become liable or subject to" expenses. *Merriam-Webster's Collegiate Dictionary* 632 (11th ed. 2014); *see The American Heritage Dictionary of the English Language* 889 (4th ed. 2000) ("To acquire or come into (something usually undesirable)").

Staffing's argument fails for two reasons. First, TMS was a prevailing party on the fraud claim and it incurred disbursements in defending that claim. Second, even if TMS, as a non-prevailing party on the defamation claims, paid the disbursements of the entire lawsuit for the benefit of the other respondents, various respondents, including Kautzman, Greene, and Reid, all incurred disbursements because they were liable for or subject to these expenses. Because various respondents incurred disbursements as prevailing parties, the district court did not abuse its discretion in affirming the court administrator's award of costs and disbursements in favor of respondents.

## VI. Jury Instructions on Contract Meaning

On cross-appeal, respondents argue that the district court erred in its jury instructions on contract meaning and that respondents deserve a new trial on the breach-of-contract claim because the error was prejudicial. We agree.

Respondents objected to the following instructions given to the jury at trial:

### Contract—Meaning

If you find the contract is ambiguous, you should determine the intent of the parties.

When contract language is reasonably susceptible to more than one interpretation, the ambiguous contract terms are to be construed against the drafter.

To determine if these instructions were error we must determine (1) whether the district court could allow the jury to determine ambiguity in the contract, (2) whether the contract was one of adhesion, and (3) if the contact was not one of adhesion, whether the district court should have given a prioritized instruction that the jury may only construe the ambiguous terms against the drafter after the evidence at trial failed to demonstrate the intent of the parties.

 Respondents raised the jury-instruction issue in their motion for a new trial, which the district court denied. "Denying a motion for a new trial on the ground of erroneous jury instruction rests within the district court's discretion, and we will not reverse absent a clear abuse of that discretion." *Youngquist v. W. Nat'l Mut. Ins. Co.*, 716 N.W.2d 383, 385 (Minn. App. 2006). Under an abuse-of-discretion standard, appellate courts may overrule the district court when the court's ruling is based on an erroneous view of the law. *City of North Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn. 2011). A jury instruction is erroneous if it materially misstates the law. *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001).

"[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). If a contract is unambiguous, the construction and effect of a contract is a question of law for a court to decide and the contract language must be given its plain and ordinary meaning. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346-47 (Minn. 2003). Whether a contract is ambiguous is also a question of law for a court to decide. *Id.* at 346. "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Art Goe-*

*bel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). "[T]he interpretation of an ambiguous contract is a question of fact for the jury." *Denelsbeck*, 666 N.W.2d at 346. If contract language is ambiguous, parol evidence may be considered to determine the parties' mutual intent. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010).

 Here, the district court ruled, prior to instructing the jury, that the contract was ambiguous and, accordingly, that parol evidence could be presented to the jury to determine the parties' intent. Testimony at trial indicated that the parties disputed the meaning of the term "management fees" in sections 3.5 and 3.6 of the TMS services agreement. Under the contract, the management fees were deducted from Staffing's commission. The parties disputed whether the "cost of payroll," which made up a portion of the management fees, included workers' compensation costs. If workers' compensation costs were included in the "cost of payroll," the costs would be incurred by Staffing as a management fee. Second, the parties disputed which termination provisions under article 11 of the TMS services agreement governed and whether a buyout fee was required. The parties disputed whether the Tricom buyout agreement constituted mutual termination, and whether the meaning of the phrase "plus fees earned" in that contract included the buyout fee in article 11 of the TMS services agreement.

Because the question of whether a contract is ambiguous is a question of law, *Denelsbeck*, 666 N.W.2d at 346, and the district court already found that the contract was ambiguous, the district court erred in instructing the jury in a way that allowed it to determine whether ambiguity existed. In order to aid the jury in its interpretation of the ambiguous contracts, the district court should have directed it as

to which terms in the contracts were ambiguous. *See, e.g., Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g Sales, Inc.*, 436 N.W.2d 121, 123 (Minn. App. 1989) (noting that the district court found the term "Docksider II-V" was ambiguous), *review denied* (Minn. Apr. 26, 1989); *H.J. Kramer Plumbing & Heating, Inc. v. Scharmer*, 386 N.W.2d 742, 746 (Minn. App. 1986) (term "Item No. 31 Sewage Disposal System" was ambiguous).

 Second, we must also determine whether the contracts were ones of adhesion, because with non-adhesion contracts, a jury construes ambiguous contract terms against the drafter as a measure of last resort. *Econ. Premier Assurance Co. v. W. Nat. Mut. Ins. Co.*, 839 N.W.2d 749, 754 (Minn. App. 2013). An adhesion contract is "[a] standard-form contract prepared by one party, to be signed by another party in a weaker position." *Black's Law Dictionary* 390 (10th ed. 2014). "[A]dhesiveness of a contract depends upon factors such as the relative bargaining power of the parties, the opportunity for negotiation, the availability of the service for which the parties contracted, whether the service was a public necessity, and the business sophistication of the parties." *Interfund Corp. v. O'Byrne*, 462 N.W.2d 86, 89 (Minn. App. 1990).[2] Here, the evidence at trial showed that the parties had relatively equal bargaining power and had the opportunity for negotiation. Staffing's CEO, Fernandez, negotiated specific terms in the contracts and read them over with Staffing's owner. Fernandez negotiated other contracts in the past for Staffing, showing business sophistication. The service TMS offered was not of public necessity, and it was available elsewhere because Staffing had worked with another company providing similar services. Finally, the parties were businesses negotiating at arm's length. The contracts in this case were not contracts of adhesion.

Third, we must decide, given that the contracts were not contracts of adhesion, whether the district court erred by instructing the jury that it was to determine the intent of the parties as well as construe ambiguous terms against the drafter. Courts sometimes resort to canons of construction to resolve ambiguities in contracts. *See Colangelo v. Norwest Mortg., Inc.*, 598 N.W.2d 14, 17-18 (Minn. App. 1999) (applying the canon of construction *expressio unius est exclusio alterius* (the mention of one thing excludes the other) to determine the meaning of a "fax fee"), *review denied* (Minn. Oct. 21, 1999). One such canon is *contra proferentem* (against the offeror), a doctrine that ambiguities in a contract are to be construed unfavorably against the drafter. *Black's Law Dictionary* 401-02 (10th ed. 2014). This canon is often applied in cases involving contracts of adhesion and is a recognition of the disparity in bargaining power that may exist between parties—e.g., sophisticated commercial entities and professionally unsophisticated consumers. *Econ. Premier Assurance Co.*, 839 N.W.2d at 754. A form contract between an insurance company and its customer is one example of an adhesion contract, but the term may ex-

2. Some cases suggest that the question of whether a contract is one of adhesion is a question of law. *See, e.g., Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 922, 925-26 (Minn. 1982) (reversing a district court's determination on summary judgment that a gym membership contract was a contract of adhesion and the contract's exculpatory clause was invalid as contrary to public policy); *Interfund Corp.*, 462 N.W.2d at 88 (examining whether a contract was one of adhesion as a factor in whether a forum selection clause was unreasonable as a matter of law). However, the issue was not raised on appeal, so we offer no opinion.

tend to leases, employment contracts, contracts for the sale of goods, and bank loan agreements. *See Melrose Gates, LLC v. Chor Moua*, 875 N.W.2d 814, 819 (Minn. 2016); *Econ. Premier Assurance Co.*, 839 N.W.2d at 754; *Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.*, 646 N.W.2d 904, 909-10 (Minn. App. 2002), *review denied* (Minn. Oct. 15, 2002); 1 Joseph M. Perillo, *Corbin on Contracts* § 1.4 (rev. ed. 1993).

"In the general context of contract law, *contra proferentem* has historically been regarded as a last resort, used only when other interpretive methods have failed to reveal the parties' intent." *Econ. Premier Assurance Co.*, 839 N.W.2d at 754; *accord* 5 Perillo, *supra*, § 24.27 (describing the rule as one of "last resort" or a "tie breaker," which yields to other techniques of contract interpretation); 11 Richard A. Lord, *Williston on Contracts* § 32.12 (4th ed. 2012) ("The rule of *contra proferentem* is generally said to be a rule of last resort and is applied only when other secondary rules of interpretation have failed to elucidate the contract's meaning."). The terms of an ambiguous contract, which is not a contract of adhesion, are construed against the drafter only after the evidence fails to reveal the mutual intent of the parties. *Beattie v. Prod. Design & Eng'g, Inc.*, 293 Minn. 139, 149, 198 N.W.2d 139, 144 (1972) ("[W]e must construe a contract in a manner designed to achieve the purpose of the contracting parties; if doubt still remains, we must construe the contract against the party who drafted it."); *Wick v. Murphy*, 237 Minn. 447, 453, 54 N.W.2d 805, 809 (1952) (applying *contra proferentem* in the absence of a clear showing that a contrary meaning was intended by the parties at the time of its execution); *Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 854 (8th Cir. 2008) ("Minnesota does follow the maxim that an ambiguous contract will be construed against the drafter, but this rule

applies only as a last resort, after all other evidence fails to demonstrate the intent of the parties."); *see Untiedt v. Grand Lab., Inc.*, 552 N.W.2d 571, 574-76 (Minn. App. 1996) (construing terms against the drafter of an attorney retainer agreement when no evidence suggested a mutual contrary intent), *review denied* (Oct. 15, 1996).

The instruction on contract meaning was a material misstatement of law because the clause instructing the jury to construe ambiguous terms against the drafter was set on an equal footing with the clause instructing the jury to determine the intent of the parties when faced with ambiguous terms. Because this case did not involve contracts of adhesion, the district court should have prioritized the two clauses, instructing the jury to first examine the evidence on the ambiguous contract terms to determine the mutual intent of the parties, and, second, if the intent of the parties could not be determined from the evidence, to construe ambiguous terms against the drafter.

Staffing relies on a number of Minnesota Supreme Court cases to argue that, if a contract is ambiguous, it must be construed against the drafter, regardless of the intent of the parties. The supreme court in *Lowry v. Kneeland*, 263 Minn. 537, 541, 117 N.W.2d 207, 210 (1962), stated, "[I]f there is doubt as to [a contract's] meaning it must be construed most strongly against the one who chose the language in drafting the instrument." *Lowry* involved an insurance contract between an insurance company and an individual alleging he was covered as an "employee" under the policy. 263 Minn. at 540-41, 117 N.W.2d at 209-210. In *Lowry*, the court employed the doctrine of *contra proferentem* in one of its usual contexts: an insurance adhesion contract. *Id.* In *Turner v. Alpha Phi Sorority House*, the supreme court stated, "Where there are ambiguous

terms or the intent is doubtful, it is axiomatic that the contract will be construed against the drafter." 276 N.W.2d 63, 66 (Minn. 1979). But, unlike this case, in *Turner* the parties introduced no extrinsic evidence as to the parties' intent on a contract term's meaning. *Id.*

More recent supreme court cases cite both *Lowry* and *Turner* for the general proposition that ambiguities are construed against the drafter. *See, e.g., Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 149 (Minn. 2002); *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). But, in *Current Tech. Concepts*, the supreme court found no ambiguities in the contract at issue and did not construe the contract against the drafter. 530 N.W.2d at 543. And, the contract in *Hilligoss* was more akin to an adhesion contract, as it was between an employer and employee, and concerned the meaning of termination for "cause" in a bonus plan. 649 N.W.2d at 147-48. "The employer-employee relationship is different from a business-to-business relationship because corporations are presumptively sophisticated parties." *Alpha Sys. Integration, Inc.*, 646 N.W.2d at 910. None of the cases cited by Staffing eliminate the "cardinal rule" that the goal of interpreting any contract is to ascertain the intent of the parties. *Lowry*, 263 Minn. at 541, 117 N.W.2d at 210.

In sum, the jury instruction materially misstated the law because it allowed the jury to construe the contract against the drafter, despite evidence of the parties' intent. A correct instruction would have made clear that the jury first considers evidence of the intent of the parties to construe ambiguous terms. If an examination of the evidence failed to demonstrate the intent of the parties, then and only then, should the jury have been instructed to construe ambiguous contract terms against the drafter. *See Beattie*, 293 Minn.

at 149, 198 N.W.2d at 144; *Wick*, 237 Minn. at 453, 54 N.W.2d at 809.

Erroneous jury instructions warrant a new trial when the instructions result in substantial prejudice. *Youngquist*, 716 N.W.2d at 386 (Minn. App. 2006).

An error is prejudicial if there is a reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury. If a jury instruction is erroneous and an appellate court is unable to determine whether the error affected the jury, a new trial should be granted.

*Id.* (quotations omitted).

Respondents were substantially prejudiced because the jury instructions allowed the jury to ignore the evidence submitted at trial on the parties' intent. The evidence at trial demonstrated that Fernandez understood that the workers' compensation costs would be passed on to Staffing, even though the TMS services agreement did not explicitly define the "cost of payroll" as including workers' compensation. Fernandez testified that, during the contract negotiations, he discussed the workers' compensation rates with respondents, and that, while Staffing performed the contract for many months, he never protested the costs being subtracted from Staffing's commission. Respondents testified they understood the "cost of payroll" as including workers' compensation, and that the "cost of payroll" made up a part of the "management fees" deducted from Staffing's commissions, per the TMS services agreement. Given this testimony and the jury instructions, jurors may well have concluded that, despite the fact that it was clear what the parties intended, the ambiguities in the contract language regarding what constitutes the "management fees" and "cost of

payroll" had to be construed against respondents, the drafters.

Charging the jury with the prioritized instructions requested by respondents likely would have changed the trial's result. The evidence on the intent of the parties regarding workers' compensation costs was strong. The contract on its face mentions the term "cost of payroll," which respondents claim included workers' compensation. With a proper instruction, the jury would not have been directed to construe these terms against respondents.

█ On the buyout fee, there was less evidence presented at trial to demonstrate that there was mutual intent, and Dourgarian and Fernandez disagreed about the terms' meaning and whether a buyout fee was due with the Tricom agreement. But the jury did consider an email to Staffing's counsel that mentioned a "buyout fee" in regard to the Tricom agreement in the amount of $280,370. The jury could have reasonably determined that the parties intended this to be a fee earned by respondents under the Tricom-agreement language, but based on the jury instructions, the jury may have construed terms in the contracts against respondents.

Because it is reasonable to conclude that a proper jury instruction would have changed the trial's result, respondents should have been granted a new trial on the breach-of-contract claim.

## VII. 608(b) Evidence that Dourgarian's Testimony Was Not Credible

█ Respondents next argue that the district court erred in allowing Staffing to ask Dourgarian if a judge had ever found his testimony not credible.

█ "The admission of evidence rests within the broad discretion of the trial court and its ruling will not be disturbed unless it is based on an erroneous view of the law or constitutes an abuse of discretion." *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45-46 (Minn. 1997) (quotation omitted).

At trial, the district court ruled that Minn. R. Evid. 608(b) allowed Staffing to ask Dourgarian whether another judge had ever found his testimony not credible in a bench trial in a separate case. In denying respondents' motion for a new trial, the district court determined that the finding by another court that Dourgarian's testimony was not credible was probative of his character for truthfulness or untruthfulness under rule 608(b).

Rule 608(b) of the Minnesota Rules of Evidence provides that:

> Specific instances of the conduct of the witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness.

Here, the question that Staffing asked Dourgarian in front of the jury was: "Mr. Dourgarian, have you ever had a judge determine that you provided testimony that was not credible?" Dourgarian answered, "Yes."

█ Respondents contend that the evidence was inadmissible under rule 608(b) because it was improper character evidence. We agree. A determination that a person's testimony is not credible is not necessarily probative of that person's character for truthfulness or untruthfulness. A judge may find a witness not credible for any number of reasons, such as a lack of knowledge, or a poor vantage point for witnessing an event. At trial, the district

court relied on our decision in *Ripka v. Mehus*, 390 N.W.2d 878, 880 (Minn. App. 1986), to determine that the question was admissible under rule 608(b). But in *Ripka*, the witness admitted under questioning that he had lied under oath in two separate cases by stating that he never took the examination for board certification in neurology when in fact he had taken the examination and failed. 390 N.W.2d at 879.

It should be noted that, even if another judge's determination that Dourgarian provided testimony that was not credible is somehow probative of Dourgarian's character for truthfulness or untruthfulness, its probative value in this case was substantially outweighed by the danger of unfair prejudice. *See* Minn. R. Evid. 403 (providing that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). The danger of unfair prejudice was high because the determination that Dourgarian had previously provided testimony that was not credible came from a judge, a person usually held in high esteem in the community, and the trial focused heavily on the credibility of the parties' explanations of the meaning of the contracts and each of their motivations. The district court erred in allowing Staffing to ask Dourgarian about another judge's credibility determination.

Because we have already concluded that respondents are entitled to a new trial based on the jury instructions in this case, we need not decide if the evidentiary error warrants a new trial.

## VIII. Costs and Disbursements to Staffing

Respondents argue that the district court's decision to award Staffing an additional $19,010.40 was an abuse of discretion because it was based on evidence outside of the record before the court administrator and was in violation of Minn. R. Civ. P. 54.04.

Whether the district court erred in its interpretation of statutes and rules authorizing the award of costs and disbursements is a legal question that appellate courts review de novo. *Dukowitz*, 841 N.W.2d at 155-56. "Where the legislature's intent is clearly discernable from plain and unambiguous language, statutory construction is neither necessary nor permitted and courts apply the statute's plain meaning." *Am. Tower, L.P.*, 636 N.W.2d at 312. The Minnesota Supreme Court has used the "plain meaning" rule to determine the meaning of a rule of civil procedure. *See, e.g., Gruenhagen v. Larson*, 310 Minn. 454, 459, 246 N.W.2d 565, 569 (1976) (examining the plain meaning of Minn. R. Civ. P. 60.02).

Minn. R. Civ. P. 54.04(a) provides that "[c]osts and disbursements shall be allowed as provided by law." Minn. Stat. § 549.04 mandates that a district court allow reasonable disbursements paid or incurred by the prevailing party. To apply for costs and disbursements, a party "must serve and file a *detailed sworn application* for taxation of costs and disbursements with the court administrator, *substantially in the form as published by the State Court Administrator*." Minn. R. Civ. P. 54.04(b) (emphasis added). If after the court administrator taxes costs and disbursements, a party wishes to appeal, it may do so to the district court. Minn. R. Civ. P. 54.04(e). "The appeal shall thereupon be decided by a district court judge and determined *upon the record before the court administrator*." *Id.* (emphasis added).

On March 3, 2016, Staffing applied for costs and disbursements in the amount of $33,718.33. Staffing did not submit invoices or receipts. Staffing submitted an applica-

tion for costs and disbursements on a form similar to the one published by the state court administrator, along with an affidavit explaining more in detail the breakdown of disbursements beyond the face of the application. Respondents objected to Staffing's application for disbursements, arguing in part that Staffing failed to produce supporting documentation. The court administrator awarded Staffing $1,427.72. In late March 2016, Staffing appealed the court administrator's decision to the district court and attached an affidavit with detailed documentation along with receipts and invoices.

On appeal from the court administrator's decision, the district court found:

> Presumably, the Court Administrator sustained Defendant's objection due to the lack of supporting documentation. This appeal could well have been avoided if Plaintiff had done what should have been obvious—provide documentation to the Deputy Court Administrator. That aside, [rule 54.04] does not expressly require supporting invoices and receipts at the court administrator level. Accordingly, the Court will exercise its discretion and consider them on appeal.

■ As noted by the district court, rule 54.04 has no requirement that invoices and receipts be provided to support an application. An application needs only to be detailed, sworn, and substantially in the form created by the state court administrator. Minn. R. Civ. P. 54.04(b). The form published by the state court administrator does not ask for receipts, but requires the applicant to break down disbursements associated with experts, depositions, and other expenses in an attachment or through further specification on the form. The rule ensures accuracy by requiring that the application must be signed "under oath or penalty of perjury."

■ In this case, Staffing submitted two sworn statements when it applied for costs and disbursements: the standard form application for costs and disbursements, and a separate affidavit containing a breakdown of disbursements for depositions, service, travel, and other expenses. The district court administrator's decision to deny Staffing's application on the basis of a lack of documentation by way of invoices and receipts was error because Staffing complied with rule 54.04(b).

The district court abused its discretion in considering information outside of the record before the court administrator because Minn. R. Civ. P. 54.04(e) prohibits such action. However, this court must ignore a harmless error. Minn. R. Civ. P. 61. The error was harmless because the costs and disbursements, which were claimed by Staffing and approved by the district court, should have been initially approved by the court administrator. The error was also harmless because, in denying certain disbursements applied for by Staffing for service on a prevailing party and party travel expenses, the district court made legal determinations that the disbursements were not allowed based on information already in Staffing's affidavit, which was in the record before the court administrator.

## DECISION

Because the contracts at issue in this case were negotiated at arm's length between parties with relatively equal bargaining power and were not adhesion contracts, the jury instructions materially misstated the law by not instructing the jury that it should construe ambiguous terms against the contract drafter only if the mutual intent of the parties could not be determined from the evidence. Because respondents were prejudiced by the instructions given to the jury, we reverse

and remand for a new trial on the breach-of-contract claims. We also conclude that Staffing's question to Dourgarian about whether a judge had ever found his testimony not credible was inadmissible character evidence and was not probative of his character for truthfulness or untruthfulness. The district court did not err in granting summary judgment on Staffing's claims, and did not abuse its discretion in denying Staffing's motion to amend the pleadings to add a claim of unpaid commissions. Finally, we affirm the district court's order on costs and disbursements.

**Affirmed in part, reversed in part, and remanded.**

ROSS, Judge (concurring specially)

I agree that a new trial is necessary because the district court's instructions directed the jury to *over*emphasize one contract interpretation tool over any relevant evidence. I write separately because I believe that the majority's remedy—announcing a new rule of law that allows the jury to apply the contract interpretation tool only as a last resort—goes beyond the question presented and also tends to *under*emphasize the interpretation tool in a way not required by Minnesota caselaw. I therefore concur in the result but not in the court's stated new rule of law.

It is true that some commentators and other jurisdictions have described the doctrine of *contra proferentem* as a doctrine of last resort, as does the majority, to be employed only after exhausting other interpretive tools designed to discern a contract's meaning. As we explained in *Economy Premier Assurance Company v. Western National Mutual Insurance Company*, "In the general context of contract law, *contra proferentem* has historically been regarded as a last resort, used only when other interpretive methods have failed to reveal the parties' intent." 839 N.W.2d 749, 754 (Minn. App. 2013) (citing 5 Joseph M. Perillo, *Corbin on Contracts* § 24.27 (rev. ed. 1998)). But we went on in *Economy Premier* to report that, at least with regard to insurance contracts in Minnesota (and elsewhere), the doctrine of *contra proferentem* is often *not* the last stop but, rather, the first stop in the interpretation of ambiguous contract terms. *Id.* at 754–55.

And the doctrine has been frequently described by the supreme court, even outside the insurance context and outside the adhesion-contract context, with no hint that it is relegated to the bottom of the interpretive-tool kit. For example, in *Turner v. Alpha Phi Sorority House*, the court explained without qualification, "Where there are ambiguous terms or the intent is doubtful, it is axiomatic that the contract will be construed against the drafter." 276 N.W.2d 63, 66 (Minn. 1979). That case involved a dispute having nothing to do with insurance and involved no unfair bargaining power; it resolved indemnification language in a contract between a general contractor and a subcontractor in a sorority-house construction project. *Id.* at 65.

Although the *Turner* court did not decide the appeal based on the doctrine, the opinion is informative for another reason: it implies (without deciding expressly) that a district court need not restrict a jury on its use of *contra proferentem*. In that case, the district court had instructed the jury about the doctrine without today's new limitation:

> The words of an instrument are to be taken most strongly against the party using them. If a contract is prepared by one of the parties and the language is ambiguous, it should be construed most strongly in favor of the opposing party—but read in the sense in which a prudent

and reasonable person would have understood it.

*Id.* at 66. The district court had also told jurors to decide meaning based on how the parties used words, instructing, "Words are to be given their ordinary popular meaning unless it is obvious that the parties used them with a different meaning." *Id.* at 67 (alternation omitted).

After the jury received both instructions—one allowing it to construe ambiguities against the drafter and the other advising it to consider the meaning the parties had given their words—the jury did not merely default to the *contra proferentem* doctrine but interpreted the contract in a manner that resulted in a verdict favoring the subcontract drafter. *Id.* at 65. That the jury was capable of hearing both these instructions (without being limited to apply *contra proferentem* only if necessary) is consistent with the supreme court's reasoning: "Although the [*contra proferentem* rule against the drafter] is generally applied, this does not, as [the appellant] seems to suggest, ineluctably lead to the conclusion that the drafter is to lose." *Id.* at 67. And that explanation in context at once both supports the majority's conclusion today that the district court misdirected the jury here and my concern that the majority's new rule overly constrains the jury's deliberative process.

Although the *Turner* court refashioned the issue as one of law rather than fact despite the jury's involvement (because neither party had actually given the jury any parol evidence to help it resolve any ambiguity), nothing in its reasoning suggests that a fact finder may construe ambiguous language against the drafter *only* after the fact finder has exhausted all other means to resolve ambiguities. *See id.* at 66. And we relied expressly on *Turner* when we affirmed the bench-trial damages findings in a business-ownership contract dispute, in part on the maxim that "if the contract's terms are in any way ambiguous, that ambiguity must be construed against [the appellant], who drafted the agreement." *Mottaz v. Gadbois*, 385 N.W.2d 345, 347 (Minn. App. 1986), *review denied* (Minn. June 13, 1986).

In sum, I agree with the majority that the district court's *contra proferentem* instruction in context implicitly directed the jury to decide fact disputes ignoring any potentially relevant parol evidence, and I agree that this improperly restrained the deliberative fact-finding process. But I do not think either the caselaw or the issue on appeal invites us to impose our own restraint on jurors—to the other extreme—prohibiting them from using the doctrine except as a last resort. I think the doctrine's place in jury deliberations has not been confined and that we should proscribe the erroneous instruction but go no further. I therefore disagree only with the majority's new jury instruction.